UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHIGAN MILLERS MUTUAL
INSURANCE COMPANY,

      Plaintiff and Counter-Defendant,

                                            CASE NO. 1:09-CV-596

v.

                                            HON. ROBERT HOLMES BELL

FIDELITY AND DEPOSIT COMPANY
OF MARYLAND,

      Defendant and Counter-Claimant,

and

SIGNATURE FARMS, L.P.,
CHERRYTREE FARMS, L.L.C. and
CINCINNATI INSURANCE COMPANY,

      Defendants.

_____/

**O P I N I O N**

      This insurance coverage dispute is before the Court on cross-motions for summary

judgment filed by Plaintiff Michigan Millers Mutual Insurance Company ("Michigan

Millers") and Defendant Fidelity and Deposit Company of Maryland ("F&D"). (Dkt. Nos.

170, 171). Defendant F&D has also filed an alternate motion for partial summary judgment.

(Dkt. No. 158.)  For the reasons that follow, the Court will grant Michigan Millers' motion

for summary judgment, deny F&D's motion for summary judgment, and deny without

prejudice F&D's alternate motion for partial summary judgment.

**I.**

On September 15, 2002, there was an explosion at a farm house in Bangor, Michigan, that resulted in the death of five members of the Lotz and Reppert families.  The farm was owned by Cherrytree Farms LLC and was managed by Signature Farms LP.  United Feeds, Inc. and Signature Farms LP were named insureds on an Agribusiness policy and a commercial umbrella liability policy from Michigan Millers (the "United Feeds Policies"). (Pl. Exs. 1, 2, United Feeds Policies.)  The day after the explosion, Michigan Millers' claims adjuster, Peter Rock, began his investigation.  (F&D Ex. 5, Rock Dep. 21.)  Because there was a dispute regarding coverage for Cherrytree, part of Mr. Rock's responsibilities included investigating what entities were covered by the Michigan Millers policies.  (*Id.* at 22-25.)

In April and May 2004 the Lotz and Reppert families filed wrongful death actions against United Feeds Inc., Signature Farms LP, Signature Farms LLC, and Cherrytree Farms LLC in Van Buren County, Michigan.[1]  On June 11, 2004, Michigan Millers agreed to provide a defense in the *Lotz* and *Reppert* actions to United Feeds and Signature Farms LP because they were named insureds, and to Signature Farms LLC because it was a partner of

---

[1]*Lotz v. Signature Farms, L.P.*, No. 04-02-204-NO (Van Buren County Cir. Ct., Apr. 23, 2004); *Reppert v. United Feeds, Inc.*, No. 04-52-270-NO (Van Buren County Cir. Ct., May 13, 2004).  (Pl. Exs. 3, 4.)

a named insured.[2]  (Pl. Ex. 5; F&D Ex. 2(Q).)  The letter was silent as to Cherrytree Farms.[3]

(*Id.*)

On June 16, 2004, Signature Farms LP and Cherrytree Farms LLC (collectively

referred to as the "Farms") filed suit against Michigan Millers, Cincinnati Insurance

Company,[4] and Henriott Group, Inc.[5] in the Hamilton County Superior Court in Indiana,

*Signature Farms LP v. Michigan Millers*, 29D01-0406-PL-528 (Hamilton Super. Ct. Ind.)

(the "Farms' Coverage Case").  The Farms alleged three claims against Michigan Millers:

breach of contract, breach of the duty of good faith and fair dealing, and reformation of

contract.  (F&D Ex. 3, Farms' 2004 Compl.).  All of the claims against Michigan Millers

were based on Michigan Millers' failure to recognize Cherrytree Farms as an insured and its

failure to defend Cherrytree Farms in the *Lotz* and *Reppert* actions.[6]

---

[2]The United Feeds policy provided that if a named insured was a partnership, its partners were also insureds.  (Pl. Ex. 5.)  Signature Farms LLC was a partner of Signature Farms LP.

[3]Michigan Millers determined that Cherrytree Farms was a corporation owned by Signature Farms LP and Shamrock Farms LLC, and that it was not a partner of Signature Farms LP.  (F&D Ex. 2D, 09/27/2002 from Michigan Millers to Signature Farms LP).

[4]United Feeds and Signature Farms LP had an excess liability insurance policy from Cincinnati.  (Farms' Coverage Case Compl. ¶ 8.)

[5]Henriott Group was the broker that procured the Michigan Millers and Cincinnati insurance policies on behalf of United Feeds and Signature LP.  (Farms' Coverage Case Comp. ¶ 9.)

[6]The Farms alleged that prior to the purchase of the United Feeds policies, United Feeds and Signature LLP notified Henriott that they wanted Cherrytree to be listed as a named insured on the policies.  The Farms alleged that either Henriott failed to obtain the

3

At the time the Farms' Coverage Case was filed in 2004, Michigan Millers was insured by Federal Insurance Company ("Federal"). (Pl. Ex. 6.) The Federal policy covered insurance services professional liability claims, and specifically excluded from coverage claims "based on, arising from, or in consequence of the underwriting of insurance." (Pl. Ex. 6, Fed. Policy §§ 11(f), 36.) Michigan Millers did not notify Federal of the 2004 Farms Coverage Case based on Michigan Millers' conclusion that the Farms' complaint only raised an underwriting claim, which was not covered by the Federal policy.

In November 2004, Michigan Millers applied for its first insurance policy with F&D. F&D issued Michigan Millers F&D SelectPlus Insurance Policy, No EOP 0000037 02 (the "Policy"), effective January 1, 2005, for Directors and Officers liability and Professional Services Claims liability. (*Id.*) (Pl. Ex. 15; F&D Ex. 27.) The Policy is a claims-made and reported renewal insurance policy. *Id.* The Policy has a $5 million limit of liability, a self-insurance retention of $750,000, and a pending or prior litigation date of December 31, 2002. (*Id.*) The Policy does not contain a duty to defend. (*Id.* at § 7(A).)

The *Lotz* wrongful death action resulted in a $14.1 million jury verdict in February 2006, (Pl. Ex. 10), but was ultimately settled for $9 million on appeal ($5 million from Michigan Millers, $2.94 million from Henriott's insurer, and $1.06 million from Cincinnati). (F&D Ex. 17.) The *Reppert* wrongful death action was settled for $1.5 million in January

---

insurance requested and misrepresented that it had obtained coverage for Cherrytree, or that Michigan Millers and Cincinnati agreed to insure Cherrytree, but then failed to list Cherrytree as a named insured on the policies. (Farms' 2004 Compl.)

4

2006, before trial ($1 million from Michigan Millers and $500,000 from Henriott's insurer). (*Id.*)

In August 2006, after the *Lotz* and *Reppert* suits were settled, the Farms entered into a settlement of their claims against Henriott Group and Cincinnati. (Pl. Ex. 11; F&D Ex. 23.) On August 18, 2006, Cincinnati, which had been a defendant in the Farms' Coverage Case, filed a motion to join the Farms' Coverage Case as a plaintiff so that it could assert claims against Michigan Millers. (Pl. Ex. 12; F&D Ex. 24.) In its proposed complaint, Cincinnati alleged that Michigan Millers breached its duties to Cincinnati and Signature Farms by negligently defending Signature Farms in the *Lotz* litigation and negligently failing to settle the *Lotz* action within its policy limits. (*Id.*) On September 29, 2006, the Farms moved to amend their complaint in the Farms' Coverage Case to assert additional claims against Michigan Millers based upon their contention that Michigan Millers negligently handled the defense of the *Lotz* action. (Pl. Ex. 11; F&D Exs. 22, 23.) In February 2007, the Indiana court granted both motions. (Pl. Exs. 16, 17; F&D Ex. 22.)

In March 2007, after the new claims were filed in the Farms' Coverage Case, Michigan Millers notified F&D of the litigation. F&D filed a reservation of rights letter noting that, while the lawsuit appeared to make a professional services claim under Insurance Clause C, coverage might be excluded under the intentional misconduct exclusion. (F&D Ex. 25, 04/19/2007 letter.) Between 2007 and 2009, F&D did not get involved in the Farms' Coverage Case. F&D's lack of involvement was consistent with Michigan Millers' $750,000

self-insurance retention.  In May 2009, F&D denied Michigan Millers' claim for coverage in the Farms' Coverage Case on the basis of Policy § 6(D), the Interrelationship of Claims provision. (F&D Ex. 25, 05/07/2009 letter).

Michigan Millers filed this complaint for declaratory relief and monetary damages. Michigan Millers seeks a declaratory judgment that the professional services claims asserted against Michigan Millers by Signature Farms, Cherrytree Farms and Cincinnati in the Farms' Coverage Case are within the coverage of the 2007-08 Policy.  Michigan Millers has also filed claims for breach of contract, equitable estoppel, and breach of the duty of good faith and fair dealing. F&D has filed a counterclaim seeking a declaration that it owes no duty to pay defense expenses or to indemnify Michigan Millers.  Michigan Millers  and F&D have now filed cross-motions for summary judgment.

## II.

The Federal Rules of Civil Procedure provide that summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In evaluating a motion for summary judgment the Court must look beyond the pleadings and assess the proof to determine whether there is a genuine need for trial.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  If the moving party carries its burden of showing there is an absence of evidence to support a claim then the nonmoving party must demonstrate by affidavits, depositions, answers to interrogatories, and admissions on file, that

there is a genuine issue of material fact for trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986).  Inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion."  *Matsushita Elec.*, 475 U.S. at 587-88.  The mere existence of a scintilla of evidence in support of the nonmoving party's position is not sufficient to create a genuine issue of material fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  The proper inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Id.* at 251-52.

III.

The parties' cross-motions for summary judgment request the Court to make a ruling on whether F&D owes Michigan Millers its defense costs and indemnity in the Farms' Coverage Case.  Although F&D raises a number of arguments in support of its request for summary judgment, the arguments predominantly flow from two essential issues:  first, whether the Farms' 2004 complaint raised a "professional services claim" as defined in the F&D Policy, and, second, whether Michigan Millers failed to timely tender the defense of the Farms' 2007 amended complaint to F&D.

**A.  The Farms' 2007 Amended Complaint**

F&D contends that the claims raised in the Farms' 2007 amended complaint do not fall within the of coverage provided by the insuring clause of the 2007 Policy because they are a continuation of a claim first made in 2004, which predates F&D coverage.  F&D also

7

contends that under section 6(D) of the Policy regarding interrelated claims, the Farms' 2007 amended complaint is deemed first made in June 2004, and accordingly is not within the scope of coverage of the 2007 Policy.  Both of these arguments are premised on F&D's contention that the Farms' 2004 complaint raised a "professional services claim."

The insuring clause of the F&D Policy, which defines the scope of coverage, provides in pertinent part that "if, during the **policy period**, any **professional services claims** are first made, the Insurer will pay on behalf of the **Company** all **loss** resulting therefrom."  (Policy, § 1(C).)  The Policy defines "Company" to mean the entity named in Item 1 of the Declarations, i.e., Michigan Millers.  The Policy defines "loss" to mean "any amount which any **Insured** is legally obligated to pay as a result of a **claim** . . .  provided, however, that **loss** shall not include (1) any obligation assumed by the **Insured** as insurer . . . under any . . . contract of insurance . . . . (Policy § 3(I)).  The Policy defines "claim" to mean "a director and officer claim or a professional services claim."  (Policy § 3(B).)  The Policy defines "professional services claim" to mean a "civil proceeding" against the Company "for a **wrongful act** . . . concerning any actual or alleged performance of or failure to perform any **professional service**."  (Policy § 3(M).) The Policy defines "professional service" to mean:

> any of the following insurance services:  **claims handling and adjusting**, safety inspection, loss control and safety engineering, premium financing, personal injury rehabilitation, subrogation operations, risk management, salvage operations, insurance consulting, actuarial consulting, credit and investigative services and notary services.

(F&D Policy § 3(L) (emphasis added).)

8

In contrast to the Federal policy that provided coverage to Michigan Millers in 2004, the F&D Policy does not expressly exclude claims based on alleged underwriting errors.[7] Nevertheless, a fair reading of the F&D Policy as a whole leads to the inevitable conclusion that the F&D Policy does not provide coverage for underwriting errors.  The Policy defines "professional services" to include certain specified insurance services.  Underwriting is not included within the list of "professional services."  In addition, the F&D Policy provides that "loss" does not include any obligation assumed by the Insured as insurer under any contract of insurance.  (Policy § 3(I).)  Moreover, the F&D Policy Proposal Form contains a place for the insured to indicate whether it desires a quote for optional coverage for "underwriting services."  (F&D Ex. 27, 2005 Policy Proposal Form, ¶ 18(A).)  Michigan Millers  did not check this box when it applied for insurance from F&D.  (*Id.*)  Walter M. Fahrman, F&D's underwriter for the Policy, acknowledged that one of the purposes of adding an underwriting endorsement would be to add coverage for claims based on errors in the preparation of a policy.  (Pl. Ex. 18, Fahrman Dep. 75-76.)  If an insured purchases the optional coverage for underwriting services, the definition for professional service is amended to include underwriting by or on behalf of the insured.  (Pl. Ex. 19, Endorsement to Amend Definitions (M).)  Michigan Millers did not purchase increased coverage for underwriting services.

The Farms' 2007 complaint includes claims that Michigan Millers mishandled the

---

[7]The Federal policy expressly excluded from coverage any claim "based upon, arising from, or in consequence of the underwriting of insurance."  (Pl. Ex. 6, at 6-7, Fed. Policy § 11(f).)

investigation of the *Lotz* matter, mishandled the defense of the wrongful death suits, destroyed evidence that inhibited the defense of the suits, and refused to engage in settlement negotiations to settle the wrongful death claims within its policy limits. (F&D Ex. 23, Farms' Proposed 2007 Amended Compl.)  There is no dispute that the new claims asserted by the Farms in 2007 and the claims asserted by Cincinnati in the Farms' Coverage Case are professional services claims as defined by the Policy.  F&D recognized as much in its April 2007 letter.  (F&D Ex. 25, 04/19/2007 letter ("I have reviewed the lawsuit it appears to make a **professional services claim** under Insuring Clause (C) against Millers'.").)

Although the claims asserted in the Farms' 2007 amended complaint are presumptively covered by the policy, F&D nevertheless contends that the claims do not fall within the insuring clause because the Policy only covers "professional services claims" that are "first made" during the policy period.  (Policy § 1(C).)  F&D contends that the Farms' 2007 Amended Complaint was merely a continuation and expansion of the Farms' 2004 claim, and therefore was not a claim that was "first made" during the policy period.  This argument assumes that the 2004 claim was a professional services claim as defined by the policy.

In its letter denying coverage to Michigan Millers, F&D raised an alternative argument under section 6(D) of the Policy:

> Both the 2004 action and the 2007 action arise out of Millers' alleged conduct in connection with the defense of Signature and/or United in the Lotz litigation and the Reppert litigation.  Therefore, pursuant to Section 6D of the Policy, they should be treated as single claim, which shall be deemed to have been first made when the earliest claim (the 2004 action) was first made – June 2004.

10

(F&D Ex. 25, 05/07/2009 letter).

Section 6(D) of the Policy, which governs limits of liability and interrelationship of claims, provides:

> (D) **Claims** based upon or arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the same or related **wrongful acts**, facts, circumstances, situations, transactions or events or the same or related series of **wrongful acts**, facts, circumstances, situations, transactions or events shall be deemed to be a single **claim**, which shall be deemed to have been first made when the earliest **claim** was first made.

(Policy, § 6(D).)  Application of § 6(D) to the facts of this case depends on whether the 2004 complaint in the Farms' Coverage Case raised a "claim" as defined in the Policy, such that the claims raised in the Farms' 2007 amended complaint would be deemed to have been first made in June 2004, when the 2004 complaint was filed.

Michigan Millers contends that because the 2004 Farms' complaint was focused solely on Michigan Millers' failure to recognize Cherrytree Farms as a named insured or additional insured on the 2002-03 Michigan Millers/United Feeds policies, it raised an underwriting claim rather than a professional services claim.

Under both section 1(C) and section 6(D), the issue is essentially the same:  did the Farms' 2004 complaint raise a professional services claim?  If it did not, then the professional services claim alleged in the 2007 amended complaint was not "first made" in 2004, and it would not be "deemed" to have been first made in 2004 under section 6(D).

The Farms filed their original complaint against Michigan Millers in 2004, soon after the *Lotz* and *Reppert* wrongful death actions were filed.  In Count I, the Farms alleged breach

of contract  against Michigan Millers for failing to undertake its obligations to Cherrytree

Farms pursuant to the Michigan Millers/United Feeds policy in relation to the *Lotz* and

*Reppert* suits.  (F&D Ex. 3, Farms' Coverage Case Compl. ¶¶ 17-19.)  In Count II, the Farms

alleged breach of the duty of good faith and fair dealing against Michigan Millers for failing

to undertake its obligations to provide coverage to Cherrytree for the *Lotz* and *Reppert* suits

pursuant to the Michigan Millers/United Feeds policy and for taking unreasonable positions

on coverage.   (*Id.* at ¶¶ 21-23.)  In Count IV, the Farms sought reformation of Michigan

Millers/United Feeds policies to include Cherrytree Farms as a named or additional insured.

(*Id.* at ¶¶  35, 37.)

F&D concedes that Counts I and IV of the Farms' Coverage Case do not raise

professional services claims.  However, F&D contends that Count II does raise a professional

services claim.[8]  F&D contends that Count II's allegations that Michigan Millers failed to

---

[8]F&D focuses on the following allegations in Count II:

22. Michigan Millers has wrongfully, erroneously, and unreasonably refused, and continues to refuse, to undertake its obligations to Cherrytree pursuant to the Michigan Millers Policies with respect to the *Reppert/Lotz* Claims and Suits without proper cause.

23.  Michigan Millers breached its duty of good faith and fair dealing to Signature and Cherrytree by, among other things:
    (a)  Unreasonably failing and refusing to undertake its obligations to Cherrytree pursuant to the Michigan Millers Policies with respect ot the *Reppert/Lotz* Claims and Suits at a time when Michigan Millers knew that Cherrytree was entitled to performance from Michigan Millers under the terms of the Michigan Millers Policies;
    (b) Compelling plaintiffs to commence and prosecute litigation in order to recover amounts due and payable under the Michigan Millers

provide claims handling and adjusting services for Cherrytree and misrepresented facts regarding coverage, is sufficient to trigger coverage under the F&D policy.  F&D notes that section 3(M) of the Policy defines a "professional services claim" to include a suit for a wrongful act concerning any actual or "alleged" performance of or failure to perform any professional service.  F&D contends that because the Farms "alleged" a failure to perform duties owed to Cherrytree Farms under the United Feeds policy, the Farms' 2004 complaint alleges a professional services claim, regardless of whether or not the Farms were correct regarding Cherrytree's entitlement to coverage.

F&D's argument is not persuasive.  All of the allegations in the Farms' 2004 complaint, including the allegations in Count II, relate to Michigan Millers' failure to insure and defend Cherrytree Farms.  There is no dispute that Cherrytree Farms was not a named insured on the Michigan Millers/United Feeds policy.  The dispute between Michigan Millers and the Farms that is the subject matter of the 2004 complaint centers around whether Cherrytree Farms should have been a named insured based upon representations allegedly made when the United Feeds policy was purchased, and whether the insurance policy should have been reformed to add Cherrytree Farms as a named insured.  These are underwriting issues rather than professional services issues.

---

Policies;
(c) Misrepresenting pertinent facts and insurance policy provisions relating to the coverage at issue; and
(d) Taking unreasonable and unfounded positions on coverage.

(Farms' Coverage Case, Compl. ¶¶ 22-23.)

13

F&D contends that the involvement of Michigan Millers' claims adjusters in the decision not to cover Cherrytree supports a conclusion that the 2004 complaint asserted a professional services claim.  F&D has produced evidence that from September 2002 until February 2004, Michigan Millers' claims adjuster, Peter Rock, investigated facts relating to whether Cherrytree Farms was covered under the policy and made representations about Cherrytree's coverage.  Michigan Millers has acknowledged that Mr. Rock's investigation included interviewing those involved in writing the United Feeds policy.[9]  F&D contends that because Michigan Millers' claims adjusters investigated coverage, took positions on coverage, and then denied coverage, the Farms' 2004 complaint, which alleged that Michigan Millers denied coverage in bad faith and took unreasonable positions on coverage, raised a professional services claim.

A claims adjuster's duties necessarily begin with verification of coverage.  There is no question that Cherrytree Farms was not covered under the Michigan Millers policy as written.  Although Michigan Millers' claims adjusters investigated issues relating to coverage, Michigan Millers has presented evidence that the underwriting department had the final

_____

[9]Michigan Millers provided the following statement in answers to interrogatories:

Peter Rock's interview of Kevin Pendleton [Henriott's agent] was part of Mr. Rock's effort to discern the identities of MMMIC's insureds, as a fundamental task associated with his claims investigation and claims handling.  Mr. Rock's investigation of Cherrytree's status was related to Mr. Rock's efforts to discern a basis for MMMIC to provide coverage to Cherrytree, despite the policy language, as well as to the other entities involved.

(F&D Ex. 32, Resp. to Interrogatory 186.)

14

authority on whether to reform the policy.  In this case the underwriting department elected not to reform the United Feeds policy to add Cherrytree Farms.  (Pl. Ex. 30, Bush Dep. 583-84, 775.)  Nevertheless, regardless of who makes the coverage determination, the decision regarding which entities to insure is an underwriting decision rather than a claims adjusting decision.  Evidence that Michigan Millers' claims adjusters were involved in investigations, discussions, and explanations as to which entities were covered by the United Feeds policy, does not convert the underwriting issue (i.e., the decision of which entities to include as insureds on the United Feeds policy) into a claims handling or adjusting issue.  Michigan Millers' failure to name Cherrytree Farms on the policy and its decision not to reform the contract to include Cherrytree Farms on the policy are underwriting issues rather than claims handling issues.  Because Cherrytree Farms was not an insured under the United Feed policy, Michigan Millers did not owe Cherrytree Farms any claims adjusting or other professional services under the policy.  The fact that the Farms alleged a breach of duty to Cherrytree Farms under the policy does not transform the Farms' underwriting claim into a professional services claim covered by the F&D Policy.

The Court concludes that because the Farms' 2004 complaint did not raise a professional services claim, neither section 1(C) nor section 6(D) of the F&D Policy bars coverage of the claims raised in the Farms' 2007 amended complaint.

## B.  Cincinnati Complaint

The parties' cross-motions for summary judgment also address Michigan Millers'

claim for coverage on the claims raised by the Cincinnati complaint.  F&D contends that the 2007 Cincinnati complaint is not a new claim because it did not commence a new proceeding, or, in the alternative, that even if it is a new claim, it is deemed to be a single claim that was first made in June 2004.  In support of this argument, F&D contends that the Cincinnati complaint raises the same facts and allegations as the Farms' 2007 amended complaint concerning Michigan Millers' handling of the defense and the settlement of the tort claims in bad faith, and is similarly barred by sections 1(C) and 6(D) of the Policy.

F&D's arguments regarding the Cincinnati complaint, like its  arguments concerning the Farms' 2007 amended complaint, are premised on the assumption that the Farms' 2004 complaint was a professional services claim.  Because the Court has already determined that Farms' 2004 complaint did not raise a professional services claim, Cincinnati's 2007 complaint, like the Farms' 2007 amended complaint, is not barred under section 1(C) or section 6(D) of the Policy.

In addition, F&D's assertion that the Cincinnati complaint relates back to the Farms' 2004 complaint has no evidentiary support.  F&D has presented evidence that when Cincinnati moved to join the Farms' Coverage Case as a plaintiff, Cincinnati asserted that it had meritorious claims against Michigan Millers "in respect of or arising out of the same transaction, occurrence or series of transactions or occurrences" as the Farm plaintiffs' claims against Michigan Millers, and had a common question of law or fact.  (Pl. Ex. 12; F&D Ex. 24.)  In addition, Cincinnati's counsel argued that the Farms' original 2004 complaint "would

16

support all of [Cincinnati's] current claims against Michigan Millers, and it clearly parallels the claims that Cincinnati has against Michigan Millers."  (F&D Ex. 37, Tr. 14.)

F&D's reliance on Cincinnati's representations is misplaced.  Contrary to Cincinnati's representations, the claims asserted in Cincinnati's complaint against Michigan Millers do not parallel or arise out of the claims alleged in the Farms' 2004 complaint.  Cincinnati, like Michigan Millers, was a named defendant in the Farms' 2004 complaint.  (F&D Ex. 3, 2004 Compl.)  Cincinnati and Michigan Millers were not adverse parties with respect to the claims raised in the 2004 complaint.  They were united in denying that Cherrytree was a covered insured.  Even when Cincinnati settled the claims raised in the 2004 complaint, Cincinnati avoided any admission that Cherrytree was or should have been a covered insured.  (F&D Ex. 17, Settlement.)  Cincinnati's 2007 complaint against Michigan Millers does not make any mention of the dispute concerning insurance coverage for Cherrytree.  In fact, it does not make any claims regarding Cherrytree whatsoever.  Cincinnati's complaint merely alleges that Michigan Millers negligently defended **Signature Farms** in the *Lotz* litigation and breached its duties to **Signature Farms** and Cincinnati when it failed to settle the *Lotz* litigation for a sum within its policy limits.  (Pl. Ex. 12, Cincinnati Compl.)

The claims handling errors alleged in the 2007 Cincinnati complaint are related to the claims raised in the Farms' proposed 2007 amended complaint, but they are not based upon, nor do they arise out of, the 2004 underwriting dispute that was at the heart of the Farms' 2004 complaint.  Accordingly, the Cincinnati complaint is a professional services claim "first

17

made" within the policy period.  It is within the scope of coverage of Policy section 1(C), and it is not barred by section 6(D).

## C.  Same Case

F&D contends that neither the Farms' 2007 amended complaint nor the Cincinnati 2007 complaint is a new claims because they did not commence a new proceeding.  Under the terms of the F&D Policy, the fact that these complaints were filed in an on-going case does not mean that they are not covered.  The Policy covers professional services claims.  A professional services claim is defined as a civil proceeding commenced for a wrongful act concerning a professional service.  The Farms' 2004 complaint was not a civil proceeding commenced for a wrongful act concerning a professional service.  The cases cited by F&D in support of the proposition that the 2007 complaints are not covered because they did not commence a new proceeding are inapposite because they involved different contract language that defined a claim as the commencement of a civil proceeding.  *See*, *e.g.*, *Nat'l Union Fire Ins. Co. v. Willis*, 296 F.3d 336 , 341-42 (5th Cir. 2002); *Cmty. Found. for Jewish Educ. v. Fed. Ins. Co.* , 16 F. App'x 462, 465 (7th Cir. 2001); *Ameriwood Indus. Int'l Corp. v. Am. Cas. Co.*, 840 F. Supp. 1143, 1152 (W.D. Mich. 1993).

## D.  Tender

F&D contends that it is entitled to summary judgment on Michigan Millers' complaint because Michigan Millers never tendered either the Farms' 2004 complaint or the Farms' 2007 Amended Complaint to F&D during the term of the 2007 policy.

There is no dispute that Michigan Millers tendered the 2007 Cincinnati complaint to F&D in a timely manner in March 2007.  Further, because the Court has already determined that the 2004 complaint was not a professional services claim as defined in the policy, the failure to tender the 2004 complaint is not relevant to the issue of whether Michigan Millers is entitled to coverage for the 2007 amended complaint.  Accordingly, for purposes of F&D's failure to tender argument, the Court is only concerned with Michigan Millers' tender of the Farms' 2007 amended complaint.

As previously noted, the Policy is a claims made and reported policy.  The Policy provides:

> COVERAGE UNDER THIS POLICY IS LIMITED TO LIABILITY RESULTING FROM CLAIMS THAT ARE FIRST MADE DURING THE POLICY PERIOD AND THAT ARE REPORTED AS SOON AS PRACTICABLE BUT NO LATER THAN 30 DAYS AFTER THE DATE OF TERMINATION OF THE POLICY PERIOD . . . .

(Policy, DECLARATIONS.)  Claims made policies are enforceable under Michigan law. *Stine v. Continental Cas. Co.*, 419 Mich. 89, 115, 349 N.W.2d 127 (1984) ("[P]olicy provisions limiting coverage to acts or omissions occurring during the policy period are not invalid as against public policy.").  Under a claims made policy, an insurer is not required to show prejudice to justify its denial of an untimely claim.  *Schubiner v. New England Ins. Co.*, 207 Mich. App. 330, 331, 523 N.W.2d 635 (1994).

Section 10 of the Policy provides in pertinent part:

(B)     The . . . **Company** shall, as a condition precedent to their rights under this policy, give to the Insurer notice in writing of any **claim** as soon as

19

> practicable, but in any event no more than 30 days after the date of termination of the **policy period**, and give the Insurer such information and cooperation as it may reasonably require.
>
> . . .
>
> (D)   Following the furnishing of notice, the **Insured** shall, as soon as practicable, furnish the Insurer with copies of reports, investigations, pleadings and all other papers in connection therewith.

(Policy § 10.)

William K. Jamnik, Michigan Millers' Vice President of Claims, testified to his belief that he sent both the Farms' 2007 amended complaint and the Cincinnati complaint to Michigan Millers' insurance agent, Marsh USA, in February 2007.  (Pl. Ex. 9, Jamnik Dep. 163.)  However, the March 7, 2007, cover letter sent by Mr. Jamnik to Marsh referenced only the Cincinnati complaint. (F&D Ex. 25.)  Moreover, the parties have stipulated that the Marsh files do not contain a copy of the Farms' 2007 amended complaint, and that Michigan Millers has no information that indicates that Marsh ever provided a copy of the Farms' 2007 amended complaint to F&D.  (F&D Ex. 29, Stip.)

F&D's Claims Counsel, Megan Manogue, requested copies of all pleadings and updates on the status of the Farms' coverage Case in April, July, and October 2007.  (Def. Exs. 26B, 26C.)  Mr. Jamnik sent a detailed status report from counsel to Ms. Manogue on January 18, 2008.  (F&D Ex. 26D, Jamnik email; F&D Ex. 26G, Manogue noes of 1/18/08; Pl. Exs. 28 & 29.)  Ms. Manogue received a second status report from counsel in April 2008. (Def. Ex. 26G, Manogue notes of 4/28/08.)  In her November 2008, email to Mr. Jamnik, Ms.

Manogue indicated that she only had the original complaint, and requested copies of the first and second amended complaints.  (F&D Ex. 26E.)  There is no dispute that Mr. Jamnik provided a copy of the Farms' 2007 amended complaint to F&D in December 2008.  (F&D Ex. 26G, Manogue notes of 12/23/08.)

For purposes of this opinion, the Court will assume that Michigan Millers did not provide a copy of the Farms' 2007 amended complaint to F&D until December 2008.  The Court nevertheless finds that Michigan Millers timely tendered the claims raised by the Farms in their 2007 amended complaint to F&D.  This finding is based on the fact that F&D was provided written notice of the Farms' claims as early as March 12, 2007.  The March 12, 2007, letter from Marsh to F&D, forwarding Mr. Jamnik's note and the Cincinnati complaint, identifies both Signature Farms and Cincinnati as claimants.  (*Id.*)  The Cincinnati summons and complaint included the case caption, which lists Signature Farms, Cherrytree Farms, and Cincinnati as plaintiffs in the suit against Michigan Millers.  (*Id.*)  The Cincinnati complaint alleges that Michigan Millers breached its duties to both Signature Farms and Cincinnati.  (*Id.*, Compl. ¶¶ 14, 16, 20.)  F&D claims counsel Megan M. Manogue's April 19, 2007, file notes indicate that Michigan Millers "submitted lawsuit filed by its insured and insured's excess carrier alleging Millers negligently failed to settle a lawsuit filed against its insured and that such failure to settle resulted in a judgment in excess of Millers' limits."  (F&D Ex. 26G.)  Ms. Manogue testified that when she saw the Cincinnati complaint, she understood that Michigan Millers had been sued by its insured, and by its insured's excess carrier.  (Pl. Ex.

21

25, Manogue Dep. 26.)  Finally, Michigan Millers provided a detailed status report from

counsel on January 18, 2008, no more than 30 days after the date of termination of the policy

period.

Michigan Millers provided written notice of the professional services claim alleged by

the Farms in their 2007 amended complaint within the time period required by the Policy.

Moreover, even though it took some time before Michigan Millers provided copies of all of

the relevant court documents, the Court is satisfied that in light of Michigan Millers' $750,000

self-retention limit, Michigan Millers furnished F&D with such information and cooperation

as F&D "reasonably required."  Accordingly, the Court finds that Michigan Millers complied

with the claims made and reporting requirements of the F&D policy.

## E.  Prior and Pending Litigation Date

F&D also contends that coverage is barred based on the Policy's prior and pending

litigation date.

The Policy has a prior and pending litigation date of December 31, 2002.  This

provision is explained in Section 4, Exclusions: "The Insurer shall not be liable to make any

payment for **loss**, including **defense expenses**, in connection with any **professional services**

**claim** . . . based on or attributable to or arising from prior or pending litigation as of

[December 31, 2002], or any actual or alleged fact, circumstance, situation, transaction or

event which forms the basis for such litigation."  (Policy § 4(C)(2)).  This provision excludes

coverage for claims made during the policy period, which arise from litigation pending as of

December 31, 2002.  F&D's underwriter for the Policy acknowledged that this provision means that if there was a covered claim first made during the Policy period, which arose from non-claim litigation instituted after December 31, 2002, it would not be excluded from coverage under this provision.  (Pl. Ex. 18, Fahrman Dep. 57-58).  That is the situation in this case.  The Farms' non-claim litigation was instituted after December 31, 2002, and the claim first arose during the Policy period.  Accordingly, the exclusion for prior and pending litigation does not apply to the Farms' 2007 amended complaint or the Cincinnati complaint.

## F.  Proposal Forms

Finally, F&D contends that Michigan Millers' failure to disclose the Farms' coverage case in its annual policy applications precludes coverage.  Policy applications for F&D policies are made on proposal forms.  F&D relies on the statements contained in the proposal forms in deciding whether to issue coverage.[10]

The proposal form for the 2005 Policy contains the following question:

20.  Have any claims been made against any entity(ies) or any person(s) proposed for this insurance (including optional coverages for which a quote is desired) in their capacity as a director, officer, employee or spouse of a director or officer of the Company, **such as would fall within the scope of the proposed insurance**?  If yes, provide details as an attachment.

---

[10]The Insuring Clause of the Policy provides that"[i]n consideration of the payment of the premium and in reliance upon all statements made and information furnished to the Insurer, including the statements made in t e Proposal Form," the Insurer agrees to pay covered losses.  (Pl. Ex. 15, Policy § 1.)  The Policy further provides that the Company "represents that the particulars and statements contained in the Proposal Form and any documents or information submitted to the Insurer in connection therewith are true, accurate and complete and are the basis of this policy and are to be considered as incorporated in and constituting part of this policy."  (Policy § 11.)

(F&D Ex. 27, 2005 Proposal Form ¶ 20 (emphasis added).)  The proposal form states in bold capital letters that any claim arising from any matters required to be disclosed in response to question 20 is excluded from the proposed insurance.  (*Id.*)

There is no dispute that Michigan Millers did not disclose the 2004 complaint on the Proposal Form for the 2005 Policy.  However, because, as noted above, the 2004 complaint did not make a professional services claim that would "fall within the scope of the proposed insurance," Michigan Millers' failure to disclose the 2004 complaint does not preclude coverage.

F&D also contends that Michigan Millers is not entitled to coverage under the 2007 Policy because Michigan Millers  failed to disclose the Farms' coverage case in the proposal form for the 2007 Policy.  Michigan Millers was not required to answer question 20 when it renewed its F&D policy.  However, F&D contends that Michigan Millers was required to disclose the Farms' coverage case in response to question 19(g).  Question 19(g) requires the applicant to provide a list of "all material litigation threatened or pending."  (Pl. Ex. 15, 2007 Policy Proposal Form ¶ 18(A).)  At the time Michigan Millers signed the proposal form on November 10, 2006, and answered "none" to question 19(g), both Cincinnati's motion to join the Farms' coverage action as a plaintiff, and the Farms' motion to file their first amended complaint were pending.  F&D contends that because Michigan Millers knew when it signed the proposal form that the Farms and Cincinnati were seeking millions of dollars from Michigan Millers, this constituted "threatened material litigation" that Michigan Millers was

24

required to disclose on the proposal form as a condition of coverage.

As evidenced by the subparts to question 19, question 19 relates to the Directors and Officers (D&O) portion of the F&D policy.[11]  All of the information requested in question 19 relates to securities issues.  In this context, the term "material litigation" refers to litigation that must be disclosed pursuant to the Securities Exchange Act of 1934.  *See* 17 C.F.R. § 229.103 (requiring disclosure of "any material pending legal proceedings, other than ordinary routine litigation incidental to the business, to which the registrant or any of its subsidiaries is a party or of which any of their property is the subject.").  Material litigation that is required to be disclosed under question 19 does not include professional services

---

[11]Question 19 provides:

**Attachments:**  Provide each of the following if they exist:
a.  The Notice to Stockholders and Proxy Statement for the last scheduled meeting.
b.  The most recent annual report (or audited financial statements with all notes and schedules if no annual report is prepared).
c.  The most recent CPA management letter and response to recommendations made therein.
d.  A list of names and major affiliations of all Directors and names of all Officers of the Company.
e.  A list of names and percent of stock owned by any shareholder(s) holding directly or beneficially 10% or more of the common stock and their affiliation to the Company.
f.  A list of all Subsidiaries proposed for this insurance . . . .
g.  List of all material litigation threatened or  pending against the Company or any person in his or her capacity as a director, officer, employee or spouse of a director of officer of the Company . . .
h.   Latest available quarterly and annual convention statements for each Company . . . .

(Ex. 15, Proposal Form Q. 19.)

claims.  Professional services claims, such as those alleged in the Farms' amended complaint and the Cincinnati complaint, are addressed in question 9, which asks whether any claim has been made under any errors and omissions policy.  Because Policy section 3(M) defines a professional services claim as a civil proceeding, and because the Farms' 2007 amended complaint and the Cincinnati 2007 complaint had not been filed when Michigan Millers applied for the 2007 Policy, Michigan Millers  properly answered "no" to this question.

For all the reasons stated above, the Court concludes that Michigan Millers  is entitled to its defense costs and indemnity for the claims raised by the Farms and Cincinnati in 2007 in the Farms' Coverage Case.  The Court will accordingly grant Michigan Millers' motion for summary judgment and deny F&D's cross-motion for summary judgment.

## IV.

Because the Court is denying F&D's motion for summary judgment, the Court must consider F&D's alternate motion for partial summary judgment requesting a declaration that any coverage potentially available to Michigan Millers under the F&D Policy is limited to the amount in excess of the $1.25 million of unutilized reinsurance coverage available to Michigan Millers from its reinsurer, Employers Reinsurance Corporation ("ERC").  (Dkt. No. 158 ).

The F&D Policy contains the following provision regarding the availability of other insurance:

(F)  Other Insurance

> This insurance shall be excess of and not contribute with other existing insurance or reinsurance, including, but not limited to, any insurance where there is a duty to defend, and regardless of whether any loss is collectible or recoverable under such other insurance or reinsurance, unless such other insurance or reinsurance is specifically excess of this policy.  This policy shall not be subject to the terms and conditions of any other insurance or reinsurance.

(F&D Policy (F).)

F&D has produced evidence that Michigan Millers has applicable reinsurance with limits of $6.6 million from ERC; that Michigan Millers has recovered $5.35 million from ERC as reimbursement for the $6 million in policy limits it paid on behalf of Signature to settle the wrongful death claims; and that Michigan Millers has not yet sought recovery from ERC for any liability that may be imposed on Michigan Millers for its failure to settle and investigate the claims against Signature, despite the $1.25 million in remaining limits provided by the reinsurer.  The ERC Casualty Excess Reinsurance Agreement defines loss to include amounts:

> (b) equal to 90% of the amount paid by the REINSURED in excess of applicable third party liability coverage policy limits occasioned by liability imposed upon the REINSURED on account of the failure of the REINSURED to settle a claim for an amount within such policy limits;
>
> (c) equal to 90% of the amount paid by the REINSURED for punitive, exemplary, or compensatory damages . . . awarded to the insured and arising out of the conduct of the REINSURED in the investigation, trial or settlement of any claim . . . ."

(Dkt. No. 159, F&D Ex. 1, Art. VI.)  The ERC policy also includes indemnity for claim expenses, which are defined to include legal expenses.  (*Id.* at Art. VI, Art. VII.)  F&D seeks a declaration that, pursuant to the Other Insurance provision in the F&D Policy, F&D's

liability is not triggered until after the $1.25 million in reinsurance is considered.

Michigan Millers does not deny that it has $1.25 million in reinsurance limits, nor does it deny that those limits may be applicable to the claims of Cincinnati and the Farms.  Instead, Michigan Millers contends that F&D's motion is speculative and premature because Michigan Millers cannot make a claim against ERC until it suffers a "loss," which is defined as amounts "paid" by Michigan Millers for damages awarded to an insured.  The Farms' Coverage Case in Indiana is ongoing.  Michigan Millers has not yet suffered a "loss" under the ERC policy because it has not paid any sums to an insured in the Indiana action.  Michigan Millers also contends that an "other insurance" provision does not apply where, as here, the two insurers are on different layers of the risk, i.e., one is a primary insurer and the other is an excess insurer.  Michigan Millers contends that the other insurance clause has no role in determining what F&D, as Michigan Millers' only errors and omissions insurance carrier, may be required to pay for Michigan Millers' alleged errors and omissions.

F&D contends that although the amount of loss is not yet determined, there is a substantial controversy with respect to the application of F&D's Other Insurance clause such that declaratory relief is warranted.

The Declaratory Judgment Act permits this court, in a case of actual controversy within its jurisdiction, to declare the rights of any interested party seeking such declaration.  28 U.S.C. § 2201.  In exercising its discretion under the Declaratory Judgment Act, the Court considers the following factors:

28

(1) whether the declaratory action would settle the controversy;
(2) whether the declaratory action would serve a useful purpose in clarifying the legal relations in issue;
(3) whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for res judicata;"
(4) whether the use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and
(5) whether there is an alternative remedy which is better or more effective.

*Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 554 (6th Cir. 2008) (quoting *Grand Trunk R.R. v. Consol. Rail Co.*, 746 F.2d 323, 326 (6th Cir.1984)).   It appears that the parties have a substantial controversy with respect to the application of the Other Insurance clause. However, the Court is not convinced that declaratory relief would serve a useful purpose at this time in clarifying the parties' legal relationships.

"'Other insurance' clauses are provisions inserted in insurance policies to vary or limit the insurer's liability when additional insurance coverage can be established to cover the same loss." *St. Paul Fire & Marine Ins. Co. v. American Home Assur. Co.*, 444 Mich. 560, 564, 514 N.W.2d 113, 115 (Mich. 1994).   "Under Michigan law, 'the policy language must be given effect, if at all possible. Thus, the policy language is most important in our analysis.'" *State Farm Fire and Cas. Co. v. Liberty Ins. Underwriters, Inc.*, 398 F. App'x 128, 130, 2010 WL 3927220, at *2 (6th Cir. 2010) (quoting *Bosco v. Bauermeister*, 456 Mich. 279, 571 N.W.2d 509, 513 (1997)).

It appears that Michigan Millers is insured against substantially the same loss by both F&D and ERC.   The F&D Policy provides coverage to Michigan Millers for losses resulting from professional services claims arising out of Michigan Millers' claims handling and

adjusting.  The ERC Policy provides coverage for losses resulting from Michigan Millers'

failure to settle and for its conduct in the investigation, trial or settlement of any claim.

F&D's Other Insurance clause provides that the F&D insurance "shall be excess of and not

contribute with other existing insurance **or reinsurance** . . . unless such other insurance **or**

**reinsurance** is specifically excess of this policy."  (F&D Policy § 11(F) (emphasis added).)

Michigan Millers has not identified any language in the ERC policy that would specifically

make the ERC insurance excess to the F&D insurance.  However, even though the two

policies cover essentially the same loss, the timing of the required payments is very different.

For example, under the F&D Policy, F&D may be required to make payment of defense costs

prior to final disposition of the claim.  (F&D Policy § 8.)  By contrast, under the ERC Policy,

there is no loss until Michigan Millers has made payment.

The Court should give effect to parties' contractual agreements with respect to the

timing of any required payments as well as to the ultimate issue of coverage.  The Court

accordingly finds that it is premature to consider F&D's alternate motion for summary

judgment regarding its Other Insurance clause.  Because of the different nature of the F&D

and the ERC policies, the Other Insurance clause may have to operate, at least in part, as a

reimbursement scheme rather than an outright excess insurance provision.  Even if, under the

Other Insurance clause, the F&D Policy will be excess to the ERC policy, application of the

Other Insurance clause would not excuse F&D from any obligations it may have to make

payments under the policy prior to final disposition of the Indiana action.  In any event, prior

to losses being established, it is premature to rule on the effect of the Other Insurance clause. Accordingly, Defendant's alternate motion for summary judgment will be denied without prejudice as premature.

## V.

In conclusion, the 2007 F&D Policy issued to Michigan Millers provides coverage for the professional services claims alleged in the Farms' 2007 Amended complaint and in the 2007 Cincinnati Complaint.  Both of these claims were timely reported to F&D and no exclusions in the F&D Policy preclude coverage to Michigan Millers.  Michigan Millers  is accordingly entitled to defense and indemnity for the 2007 claims raised by the Farms and Cincinnati.  Michigan Millers' motion for summary judgment will be granted, and F&D's cross-motion for summary judgment will be denied.  F&D's alternate motion for partial summary judgment will be denied without prejudice as premature.

An order and judgment consistent with this opinion will be entered.


Dated: August 15, 2011                          /s/ Robert Holmes Bell
                                                ROBERT HOLMES BELL
                                                UNITED STATES DISTRICT JUDGE

31